UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
UNITED STATES OF AMERICA,

                                                                  **MEMORANDUM AND ORDER**
               -against-                                  10-cr-730 (DLI)

WARD ONSA,

                       Defendant.
-------------------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

       On December 15, 2011, defendant Ward Onsa ("Defendant") pled guilty to one count of securities fraud in violation of 17 C.F.R. § 240.10b-5 and 15 U.S.C. §§ 78j(b), 78ff. At a sentencing hearing on July 27, 2012, for the reasons stated on the record, Defendant was sentenced to 78 months' imprisonment and three years of supervised release, and was ordered to pay his victims restitution. Prior to sentencing, Defendant objected to, *inter alia*, (1) the Probation Department's assertion that the court should apply a four-point offense level enhancement under United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 2B1.1(b)(18)(A) because Defendant was an "investment adviser," and (2) the Probation Department's calculation of Defendant's victims' losses of over $2.5 million and application of an 18-point offense level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(J). As the court explained on the record[1] during sentencing, and as set forth below, the court finds that the four-point offense level investment adviser enhancement applies to Defendant's conduct and the proper calculation of the victims' losses requires an 18-point offense level enhancement.

---

[1] The record of Defendant's sentencing on July 27, 2012 is fully incorporated herein.

## BACKGROUND

Defendant began to solicit investor funds through an entity he formed and managed, Ward Onsa & Company, in 1996. (Presentence Investigation Report, Dkt. Entry 22 ("PSR"), ¶ 4.) He told investors that he would purchase securities consistent with a "bearish" view of the stock markets and guaranteed his investors a 25% annual return on their capital ("interest payments"). (*Id.*) As compensation for his services, Defendant was to receive any profits above a 25% return on his clients' investments. (*Id.* ¶ 44.) Between 1996 and 2002, Defendant used the investors' money to purchase securities, futures contracts and options to buy futures contracts. (*Id.* ¶ 5.) Even though his investments did not produce a 25% return, he sent the interest payments to the investors. (*Id.*) By 2003, Defendant had lost all of the investors' money as a result of trading losses and the interest payments to investors, but did not disclose these losses. (*Id.*)

As Ward Onsa & Company was collapsing, Defendant formed and began to solicit investors for a new hedge fund, New Century Hedge Fund Partners I, LP ("New Century"). (*Id.* ¶¶ 3, 6.) He was the sole portfolio manager for the Fund and had exclusive control over its trading accounts. (*Id.* ¶ 3.) In return for these services, Defendant was to receive 50% of New Century's profits as compensation. (*Id.* ¶ 43.) Defendant did not disclose the demise of Ward Onsa & Company to his new investors. (*Id.* ¶ 6.)

From approximately September 2005 to October 6, 2010, Defendant received more than $5 million of investor money into New Century, which he used to purchase positions in securities, futures contracts and options to buy futures contracts. (*Id.* ¶ 7.) New Century's investments lost money and it became insolvent in December 2007 when a group of investors known as the "10748 Group" redeemed $2.6 million from New Century. (*Id.* ¶¶ 7-8.) Although

New Century had only approximately $1.5 million in assets at the time, Defendant agreed to pay these investors the $2.6 million in redemptions over a period of time, and did not disclose the losses the fund had incurred. (*Id.* ¶ 8.)

Despite New Century's insolvency, Defendant continued to solicit additional investor money for the fund. (*Id.* ¶ 9.) Unbeknownst to the new investors, Defendant used the new investor money to pay redemptions to the group of investors who had redeemed the $2.6 million. (*Id.*) Specifically, Defendant persuaded seventeen different people to transfer more than $2.5 million from their individual retirement accounts into New Century. (*Id.* ¶ 10.) To keep the scheme hidden from the victims, Defendant provided them with account statements showing fraudulently inflated balances. (*Id.*)

Defendant's fraudulent Ponzi scheme was uncovered and, following an investigation, on November 18, 2011, Defendant was indicted by a Federal Grand Jury of this district for one count of securities fraud in violation of 17 C.F.R. § 240.10b-5 and 15 U.S.C. §§ 78j(b), 78ff, and six counts of wire fraud in violation of 18 U.S.C. § 1343. (Indictment, Dkt. Entry 3, ¶¶ 15-18.) On December 15, 2011, Defendant pled guilty pursuant to a plea agreement to securities fraud under Count One of the indictment. (*See* Criminal Cause for Pleading, Dkt. Entry 21.)

On July 27, 2012, the court held a sentencing hearing. At the hearing, the court adopted the Guidelines offense level of 28 recommended by the Probation Department (*see* PSR ¶¶ 15-25), which corresponds to a sentence Guidelines range of 78 to 97 months' imprisonment. In calculating the offense level, the court held, over the objections of Defendant, that Defendant's conduct warranted an 18-point offense level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(J) because Defendant caused losses greater than $2.5 million but less than $7 million, as well as a

four-point offense level investment adviser enhancement pursuant to U.S.S.G. § 2B1.1(b)(18)(A).

The court also heard arguments from Defense counsel and the government, as well as statements from Defendant and from three of Defendant's victims. After taking into account the factors listed in 18 U.S.C. § 3553(a), the court determined that a sentence within the Guidelines range was appropriate. Specifically, the court imposed a sentence of 78 months' imprisonment and three years of supervised release, finding that it was sufficient but not greater than necessary to comply with the purposes of 18 U.S.C. § 3553(a).

## DISCUSSION

### I. Investment Adviser Enhancement

In calculating Defendant's offense level under the Guidelines in its Presentence Investigation Report, the Probation Department applied a four-point offense level enhancement pursuant to U.S.S.G. § 2B1.1(b)(18)(A) because Defendant's offense was a violation of securities laws, during which Defendant was an investment adviser. (*See* PSR ¶ 19.) Defendant objected, asserting that a four-point offense level enhancement was not appropriate because Defendant was not acting as an investment adviser in perpetrating his scheme, as recognized in the estimated Guidelines range contained in Defendant's plea agreement. (*See* Def.'s Sent. Mem., Dkt. Entry 23, at 27-28; Def.'s Supp. Sent. Mem., Dkt. Entry 27, at 3-5.) The government also contended that the investment adviser enhancement was not warranted because Defendant was not advising investors, but was managing a pool of money. (*See* Gov't Sent. Mem., Dkt. Entry 24, at 2-3.)

The court agrees with the Probation Department, disagrees with the government and Defendant, and finds that Defendant was acting as an investment adviser. Under the Guidelines,

the term "investment adviser" has the same definition as section 202(a)(11) of the Investment Advisers Act of 1940, *see* U.S.S.G. § 2B1.1, Application Note 14(A), which defines "investment adviser" as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities." 15 U.S.C. § 80b-2(a)(11).

The Second Circuit has held that portfolio managers for hedge funds who manage the investors' money in return for a percentage of the profit by directing the fund to purchase and sell securities falls within the definition of investment adviser for purposes of the Investment Advisers Act. *See Abrahamson v. Fleschner*, 568 F. 2d 862 (2d Cir. 1977), *overruled in part on other grounds by Transam. Mortg. Advisors, Inc. v. Lewis*, 444 U.S. 11 (1979). In *Abrahamson*, the court found that general partners in a hedge fund who were sending false statements about the firm's holdings to limited partner investors were investment advisers because they were to receive compensation, including a percentage of any profits, in return for managing the investments in the hedge fund. *Id.* at 870. The court explained that:

> the monthly reports which contained the alleged fraudulent representations were reports which provided investment advice to the [investors]. The general partners' compensation depended in part upon the firm's net profits and capital gains. . . . In deciding whether or not to withdraw their funds from the pool, the limited partners necessarily relied heavily on the reports they received from the general partners.

*Id*.

Here, the record reflects that Defendant was engaging in conduct similar to that of the defendants in *Abrahamson*. The Indictment describes that Defendant "managed investor funds and provided investment advice" in his role as a hedge fund portfolio manager. (Indictment ¶ 1.)

5

Defendant gave investment advice to New Century by managing its portfolio and determining which securities the fund should purchase with the investors' money. (*See id.* ¶ 7.) In addition, Defendant advised investors by persuading them to turn over their money to New Century so it could be managed by Defendant. (*See id.* ¶ 11.) Defendant also effectively provided advice to his investors/victims by preparing and distributing account statements with inflated values, which misled the investors as to the advisability of keeping their money with New Century. (*See id.* ¶¶ 10-11.) Defendant was to receive compensation for the services he purportedly was providing New Century and its investors in the form of a percentage of New Century's profits. (*See* PSR ¶ 43.) Accordingly, pursuant to *Abrahamson*, Defendant was providing investment advice for compensation for purposes of the Investment Advisers Act of 1940.

Defendant relies on *United States v. Regensburg*, 635 F. Supp. 2d 306 (S.D.N.Y. 2009), *aff'd*, 381 F. App'x 60 (2nd Cir. 2010), where the court did not apply the four-point offense level investment adviser enhancement because the defendant "did not receive compensation in return for the business of providing advice to others. Rather, he was to receive a percentage of the profits, if any, that an investor garnered from his or her investment." *Id.* at 311. However, there is little description of the defendant's conduct in that case and no analysis as to why a percentage of profits cannot be considered "compensation" under the Investment Advisers Act of 1940, particularly in light of *Abrahamson*. Notably, the trial court's decision on this ground was not challenged on appeal and the Second Circuit's opinion affirming the trial court's rulings did not address this issue at all.

Moreover, the court was unable to find any Second Circuit decisions other than *Abrahamson* that discuss the issue of whether a portfolio manager with a hedge fund can be an investment adviser under the circumstances presented here. Indeed, recently, *Abrahamson* has

6

been followed by other district courts in this circuit in finding that hedge fund portfolio managers are investment advisers under the Investment Advisers Act of 1940. *See SEC v. Juno Mother Earth Asset Mgmt., LLC*, 2012 WL 685302, at *6 (S.D.N.Y. Mar. 2, 2012) (holding that allegations that portfolio manager of hedge fund and others received incentive fees "clearly establish that the individual defendants managed the funds of others for compensation and hence qualify as investment advisers under the Advisers Act").; *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 383 (S.D.N.Y. 2007) (relying upon *Abrahamson* in holding that hedge fund manager was investment adviser).

Therefore, because Defendant was providing investment advice for compensation by purportedly managing New Century's portfolio, advising victims to invest with New Century, and preparing and distributing investment reports, any of which alone would qualify him as an investment adviser, applying the four-point offense level investment adviser enhancement is warranted.

## II. Loss Calculations

In determining Defendant's total offense level under the Guidelines, the Probation Department applied an 18-point offense level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(J), because it determined the victims' losses were more than $2.5 million. (*See* PSR ¶ 17; Third Addendum to the PSR, Dkt. Entry 37.)

Defendant objected to this calculation, asserting that the losses were between $1 million and $2.5 million, and therefore a 16-point offense level enhancement applied. (*See* Def.'s Sent. Mem. 25-27.) Specifically, Defendant argued that the Probation Department's loss calculation omits the over $500,000 seized from New Century's accounts and another unspecified bank account by the 10748 Group pursuant to its civil judgment, as well as another $30,000 payment

7

made to two members of the 10748 Group. (*Id.* 26.) Defendant further contended that the Probation Department's calculation does not reflect the approximately $365,000 paid by the 10748 Group to purchase an ownership interest in New Century from a co-owner of the hedge fund, as this money technically was not invested in New Century's investment fund. (*Id.*) Defendant also asserted that the Probation Department's calculation did not account for over $100,000 in checks that an individual who also worked with New Century and was a fiduciary to the 10748 Group wrote to himself, as the money should have been distributed to the members of the 10748 Group by that individual. (*Id.*; Def.'s Second Supp. Sent. Mem., Dkt. Entry 35, at 3.) Consistent with the plea agreement, the government also contended that the losses were between $1 million and $2.5 million because, according to the government, the court should take into account money recovered by members of the 10748 Group. (*See* Gov't Sent. Mem. 3.)

The court adopts the Probation Department's final loss calculation of over $3.1 million, because the gains the 10748 group purportedly realized cannot be used to off-set the losses suffered by other victims. Under the Guidelines, the offense level is increased by 18-points if the victims' loss amount is over $2.5 million and less than $7 million. U.S.S.G. § 2B1.1(b)(1)(J). In determining the loss amount, the sentencing court "need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1, Application Note 3(C); *see also United States v. Rigas*, 583 F. 3d 108, 120 (2d Cir. 2009). The Guidelines specifically address the proper loss calculation in Ponzi or other fraudulent investment schemes, such as the scheme run by Defendant. Specifically:

> In a case involving a fraudulent investment scheme, such as a Ponzi scheme, loss shall not be reduced by the money or the value of the property transferred to any individual investor in the scheme in excess of that investor's principal investment (i.e., the gain to an individual investor in the scheme shall not be used to offset the loss to another individual investor in the scheme).

U.S.S.G. § 2B1.1, Application Note 3(F)(iv).

8

It is clear that Defendant was running a Ponzi scheme. As the Second Circuit recently explained, "[i]n a typical Ponzi scheme, the schemer will 'use[] the investments of new and existing customers to fund withdrawals of principal and supposed profit made by other customers.'" *United States v. Hsu*, 669 F. 3d 112, 114 (2d Cir. 2012) (quoting *In re Bernard L. Madoff Inv. Sec. LLC*, 654 F. 3d 229, 232 (2d Cir. 2011)). Here, Defendant set up an investment fund, used new investors' money in New Century to pay off other investors who had withdrawn money, and sent the remaining investors false account statements with inflated values hiding the losses. (*See* PSR ¶ 10.) This is a classic Ponzi scheme, and, therefore, Defendant is not entitled to use gains made by members of the 10748 Group to offset the substantial losses incurred by other victims.

While Defendant acknowledged that "net winners" ordinarily do not offset "net losers" for loss calculation purposes, Defendant argued that, because certain fiduciaries of the 10748 Group were "net winners," they should have distributed their surplus to other members of the 10748 Group who were "net losers," thus offsetting the total loss amount. (*See* Def.'s Second Supp. Sent. Mem. 5-6.)

However, even if the court ignored all losses from members of the 10748 Group, the loss amount would still be over $2.5 million. With the exception of six, all of the individual members of the 10748 Group either were not included as victims or were included as victims but assigned a zero loss amount for loss calculation purposes because they were "net winners," and thus did not incur any losses. Those individuals, therefore, are not factored into the $3.1 million loss amount calculated by the Probation Department. With respect to the six 10748 Group members who were deemed "net losers," the Probation Department and the court took into account their recoveries and lowered their loss amounts accordingly. (*See* Third Addendum to the PSR; Gov't

Letter dated June 18, 2012, Dkt. Entry 34, at 4.) Yet, even if the court ignored the remaining losses from these six individuals, it would only lower the loss amount by approximately $344,700, and the total loss amount would still be over $2.7 million. In other words, even if none of the losses from members of the 10748 Group were considered, the loss amount would still be between $2.5 million and $7 million, and the 18-point offense level enhancement would still apply.

Accordingly, the 18-point offense level enhancement is appropriate under U.S.S.G. § 2B1.1(b)(1)(J).

## CONCLUSION

For the foregoing reasons, Defendant's conduct warrants a four-point offense level investment adviser enhancement pursuant to U.S.S.G. § 2B1.1(b)(18)(A) and an 18-point offense level enhancement pursuant to U.S.S.G. § 2B1.1(b)(1)(J).

SO ORDERED.

DATED: Brooklyn, New York
          March 1, 2013

                                            _____/s/_____
                                            DORA L. IRIZARRY
                                        United States District Judge